# In the United States Court of Federal Claims

No. 15-878T
Filed: December 15, 2017
NOT FOR PUBLICATION

|  |  |
|---|---|
| MARC H. PRYDE and<br>LISA R. PRYDE,<br><br>                    Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>                    Defendant. | I.R.C. § 172; Net Operating Loss;<br>Carryback; Theft Loss Deduction;<br>I.R.C. § 165; Bad Debt Deduction;<br>I.R.C. § 166; RCFC 56; Res<br>Judicata; Judicial Notice. |

*Brian G. Isaacson*, Attorney of Record, Isaacson Law Firm, Seattle, WA, for plaintiffs.

*Brian James Sullivan*, Trial Attorney, *Jason S. Selmont*, Trial Attorney, Court of Federal Claims Section, *Robert J. Higgins*, Of Counsel, *David I. Pincus*, Chief, Court of Federal Claims Section, *David A. Hubbert*, Acting Assistant Attorney General, Tax Division, United States Department of Justice, Washington, DC, for defendant.

## MEMORANDUM OPINION AND ORDER

## I.     INTRODUCTION

In this tax refund action, plaintiffs, Marc H. Pryde and Lisa R. Pryde, seek to recover a tax refund in the amount of $876,352.00 in connection with certain financial losses associated with several defaulted loans, based upon the bad business debt deduction under Internal Revenue Code ("I.R.C.") § 166(a); the theft loss deduction under I.R.C. § 165(c); Revenue Ruling 2009-9; and the safe-harbor provision set forth in Revenue Procedure 2009-20. *See generally* Compl. The parties have filed cross-motions for summary judgment on the issue of whether plaintiffs are entitled to a tax refund based upon the aforementioned provisions, pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). *See generally* Pl. Mot.; Def. Mot. For the reasons discussed below, the Court **DENIES** plaintiffs' motion for summary judgment, or, in the alternative, partial summary judgment and **GRANTS-IN-PART** the government's cross-motion for summary judgment.

## II.      FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.      FACTUAL BACKGROUND

In this tax refund action, plaintiffs, Marc H. Pryde and Lisa R. Pryde, seek to recover a tax refund in the amount of $876,352.00 in connection with certain financial losses associated with several defaulted loans, based upon the bad business debt deduction under I.R.C. § 166(a); the theft loss deduction under I.R.C. § 165(c); Revenue Ruling 2009-9; and the safe-harbor provision set forth in Revenue Procedure 2009-20.  *See generally* Compl.  Plaintiffs claimed the bad business debt and theft loss deductions in tax year 2009, and they seek to carryback the unused deductible losses to 2004.  *Id.* ¶ 5.  Plaintiffs also seek to carryforward any remaining deductible losses to 2005.  *Id.*  And so, plaintiffs seek tax refunds in the amounts of $36,000.00 for tax year 2009; $85,400.00 for tax year 2004; and $754,952.00 for tax year 2005.[2]  *Id.*

#### 1.      The Pryde Family Real Estate Business

As background, plaintiffs are a married couple and they reside in Washington State.  *Id.* ¶ 6.  The Pryde family has been involved in the real estate development business in the Seattle area for several decades.  *Id.* ¶¶ 13-16.  The father of Marc Pryde, Harry Pryde, began work in the real estate industry in the 1940s.  Def. Ex. 1 at 6.  In the late 1980s, Marc Pryde joined the family business as the general counsel for the Pryde Corporation.  Def. Ex. 2 at 4.

#### 2.      The Mastro Loans

In addition to developing real estate, the Pryde family occasionally lent money to others.  Compl. ¶¶ 21-22.  Specifically relevant to this tax refund dispute, Marc Pryde made several loans to Michael R. Mastro—a former Seattle-based real estate developer, lender, and investor.  *Id.*; *see also* Compl. Ex. D.

---

[1] The facts recited in this Memorandum Opinion and Order are taken from plaintiffs' complaint ("Compl.") and the exhibits thereto ("Compl. Ex. ___"); plaintiffs' motion for summary judgment, or, in the alternative, partial summary judgment ("Pl. Mot.") and the exhibits attached thereto ("Pl. Ex. ___"); the government's response and opposition to plaintiffs' motion and cross-motion for summary judgment ("Def. Mot.") and the exhibits attached thereto ("Def. Ex. ___"); the Declaration of Jex Bjorn ("Bjorn Decl."); and the Supplemental Declaration of Jex Bjorn ("Bjorn Supp. Decl.").

[2] During discovery, plaintiffs were informed that they had already received $36,000.00 as a tax refund for tax year 2009.  *See* Def. Mot. at 11.  And so, the parties filed a joint stipulation of dismissal with regards to plaintiffs' tax year 2009 claim on February 8, 2016.  *See* Joint Stipulation of Dismissal (Docket Entry No. 13).

Specifically, on February 3, 2006, Marc Pryde loaned $5 million to Mr. Mastro.  Compl. ¶¶ 1, 22.  Mr. Mastro made payments to reduce the $5 million principal balance of this loan down to $2 million.  *Id.* ¶¶ 2, 31.

On May 23, 2008, Marc Pryde made another loan to Mr. Mastro in the amount of $400,000.00.  *Id.* ¶ 2.  In addition, on December 2, 2008, Marc Pryde made another loan to Mr. Mastro in the amount of $2 million (the February 2, 2006; May 23, 2008; and December 2, 2008 loans, collectively, the "Mastro Loans").  *Id.*  As of December 2, 2008, the outstanding principal balance of the Mastro Loans was $4,400,000.00.  *Id.* ¶¶ 2, 31.

Mr. Mastro also issued an unsecured promissory note to Marc Pryde in connection with these loans.  *See generally* Compl. Ex. A.  Under the terms of the Mastro Loans, the proceeds of the loans were to be payable on demand.  Compl. Ex. A at 1; Compl. Ex. D at 1; Def. Ex. 2 at 26-27.  Between 2006 and 2009, Mr. Mastro made monthly interest payments to Marc Pryde in connection with the Mastro Loans.  *See* Def. Mot. at 6; Def. Ex. 2 at 26, 42.  To that end, Mr. Mastro has paid Marc Pryde more than $1.3 million in interest in connection with the Mastro Loans.  Def. Mot. at 6; Def. Ex. 1 at 46.  *See generally* Def. Exs. 5, 19.

### 3.      The Great Recession And Mastro Bankruptcy

The Seattle real estate market rapidly deteriorated during the latter part of 2008 through mid-2009, as a result of the Nation's financial crisis.  *See* Def. Mot. at 7; Def. Ex. 8 at 7; Def. Ex. 16 at 7.  *See generally* Def. Ex. 17.  As a result, the demand for real estate shriveled and property values plummeted.  Def. Mot. at 8; Def. Ex. 8 at 7, 14; Def. Ex. 16 at 7.  *See generally* Def. Ex. 17.

These adverse conditions crippled Mr. Mastro's properties located in the Seattle-area real estate market.  Def. Mot. at 8.  And so, by March 2009, Mr. Mastro was unable to meet his bank loan payment obligations.  Def. Ex. 6 at 12-13; Def. Ex. 8 at 11; Def. Ex. 9 at 20-21.

On July 10, 2009, three banks—Columbia State Bank, First Sound Bank, and Venture Bank—filed an involuntary bankruptcy petition against Mr. Mastro in the United States Bankruptcy Court for the Western District of Washington (the "Bankruptcy Proceedings").  Compl. ¶ 25.  *See generally* Pl. Ex. A.  In his first report to creditors in these Bankruptcy Proceedings, the bankruptcy trustee, James Rigby, stated that:

Mastro's state of insolvency did not arrive overnight. Mastro spent the time frame from at least mid 2008 through mid 2009 providing many creditors with second, third and fourth place liens against real estate property and assigning his promissory notes receivable. . . . Had the Mastro bankruptcy proceedings been filed one year earlier, prior to the assignment of significant assets to creditors and cash drawn down, there would probably have been more additional funds available for general unsecured creditors. But that is not the case.

Pl. Ex. D at 2.

As a result of the Bankruptcy Proceedings, Marc Pryde discovered that Mr. Mastro made allegedly fraudulent representations to convince him to make the Mastro Loans. Compl. ¶ 26. In this regard, plaintiffs maintain that the 2009 Statement of Financial Condition that Mr. Mastro provided to Marc Pryde fraudulently represented that Mr. Mastro had a positive net worth of $125,653,341.00. *Id.* In contrast, Mr. Mastro's Bankruptcy Schedules reported a negative net worth of $82,871,897.00 in 2009. *Id.* Marc Pryde filed a proof of claim for $4,422,000.00 in the Bankruptcy Proceedings on December 4, 2009. Pl. Ex. E at 1.

On October 1, 2009, the State of Washington's Department of Financial Institutions Securities Division filed a statement of charges and notice of intent to enter an order to cease and desist, to revoke exemptions, and to impose a fine against Mr. Mastro. *See* Compl. Ex. E at 13-14; *In the Matter of Determining whether there has been a violation of the Securities Act of Washington by Michael R. Mastro, doing business as Mastro Properties*, Order No. S-09-038-09-SC0l (Oct. 1, 2009). In that proceeding, the State of Washington's Department of Financial Institutions alleged that Mr. Mastro violated state securities laws by selling unregistered securities and by making untrue statements of material fact in the course of some of those sales. *See* Def. Mot. at 8. *See generally* Def. Ex. 20. On January 10, 2010, Mr. Mastro entered into a consent order with the Department of Financial Institutions and agreed to cease and desist from violating the anti-fraud section of the Securities Act of Washington and to pay a fine. Compl. ¶ 34; Def. Mot. at 8-9; Def. Ex. 20 at 17-20.

Mr. Mastro's troubles did not end, however, with this consent order. On October 25, 2012, a federal grand jury sitting in the United States District Court for the Western District of Washington returned a 43-count indictment charging Mr. Mastro and his wife with

bankruptcy-related crimes.[3]  *See* Coml. Ex. H; *see also United States v. Mastro*, No. CR12-320 JCC (W.D. Wash. filed Oct. 25, 2012).  The superseding indictment, filed November 7, 2012, provides, among other things, that:

> Beginning on a date uncertain, but in or about 2008, and continuing through at least in or about August 2011, within the Western District of Washington and elsewhere, MICHAEL R. MASTRO and LINDA A. MASTRO, and others known and unknown to the Grand Jury, knowingly and willfully devised and attempted to devise, and executed and attempted to execute, a scheme and artifice to defraud the Bankruptcy Court for the Western District of Washington, the Court-appointed trustee in bankruptcy, and creditors in connection with an involuntary bankruptcy proceeding filed on or about July 10, 2009, under Title 11, United States Code, *In re: Michael R. Mastro*, Case No. 09-16841 (the 'bankruptcy proceeding'), in that they prepared and filed and caused to be prepared and filed materially false and fraudulent documents, and made and caused to be made materially false and fraudulent representations concerning and in relation to that proceeding under Title 11, United States Code . . . .

Pl. Ex. J at ¶ 4.  The superseding indictment also alleges that certain personal property—a checking account, the Mastro's home, home furnishings, and two diamond rings—were concealed during the Bankruptcy Proceedings.  *Id.* at ¶ 5.  Nearly all of the property specified in the superseding indictment has been seized and the proceeds from the sale of these items have been distributed to Mr. Mastro's unsecured creditors.  *See* Def. Mot. at 9; Def. Ex. 16 at 8-9; *see, e.g.*, Def. Exs. 21-22.  To that end, in February 2012, the plaintiffs received a check in the amount of $44,504.00 from Mr. Mastro's bankruptcy trustee.  Compl. ¶ 41.

### 4.      Plaintiffs' 2009 Tax Returns

The Internal Revenue Service ("IRS") received plaintiffs' original return for tax year 2009 on May 28, 2010.  Def. Ex. 23 at 2.  This return does not report any losses associated with the Mastro Loans.[4]  *See generally* Def. Ex. 14.  Based upon this return, the IRS refunded to plaintiffs the sum of $36,000.00 on February 21, 2011.  Def. Ex. 23 at 2.

---

[3] At the time of the aforementioned indictment, Mr. Mastro had fled the country and was living in France. Pl. Ex. I at 3; Def. Mot. at 9.  Extradition requests for Mr. Mastro and his wife have been denied on humanitarian grounds and Mr. Mastro remains abroad.  Def. Mot. at 9.

[4] Plaintiffs reported the Mastro Loan interest on their 2006, 2007, 2008, and originally filed 2009 income tax returns as interest on a Schedule B, Interest and Ordinary Dividends.  *See* Def. Ex. 11 at 7-8, 10, 15. *See generally* Def. Exs. 5, 10, 12-14.

The parties disagree about whether plaintiffs' original 2009 return contained a five-year net operating loss ("NOL") carryback election statement. *See generally* Def. Ex. 14; Bjorn Supp. Decl. at ¶ 6. The return in the IRS's files does not include a five-year NOL carryback election statement pursuant to Revenue Procedure 2009-52. *See generally* Def. Ex. 14. But, plaintiffs' accountant, Jex Bjorn, states in his supplemental declaration that plaintiffs' "original [2009] return was filed with the government on May 19, 2010 and contains the election statement required under Rev. Proc. 2009-50. . . ." Bjorn Supp. Decl. at ¶ 6. Mr. Bjorn further states in his supplemental declaration that he has attached "a true and correct copy of [plaintiffs'] original 2009 tax return that [he] filed with the IRS" to this supplemental declaration. *Id.* This document is neither signed nor dated by plaintiffs. *Id.* at Ex. F at 26.

On April 17, April 18, and May 24, 2011, the IRS received several amended tax returns from plaintiffs for the 2009 tax year. *See* Def. Mot. at 10; Def. Ex. 23 at 2. *See generally* Def. Exs. 24-26. These amended returns report the Mastro Loans as a bad business debt, or, alternatively, as a theft loss. Def. Mot. at 10. *See generally* Def. Exs. 24-26. These amended returns also include five-year NOL carryback election statements that have been prepared in accordance with Revenue Procedure 2009-52. Def. Mot. at 10; Def. Ex. 24 at 34; Def. Ex. 25 at 38. The IRS has taken no action with respect to these returns. *See generally* Def. Ex. 23.

On October 25, 2013, plaintiffs submitted an additional amended return for tax year 2009. Def. Ex. 23 at 3. *See generally* Compl. Ex. B. In this return, plaintiffs characterized the Mastro Loans as a bad business debt under I.R.C. § 166(a); a theft loss under I.R.C. § 165(c); or, alternatively, as eligible for safe-harbor relief under Revenue Procedure 2009-20. Compl. Ex. B at 6. In this return, plaintiffs also sought to carryback unused deductible losses to tax year 2004, and to carryforward remaining amounts to 2005. *See generally* Compl. Ex. B.

### 5.      Plaintiffs' Amended 2004 And 2005 Tax Returns

The IRS's certified transcripts show that on April 18, 2011, the IRS received plaintiffs' amended returns for the 2004 and 2005 tax years, carrying back the remaining deductible losses associated with the Mastro Loans from 2009 to 2004 and forward to 2005. *See* Def Mot. at 10; Def. Ex. 27 at 3; Def. Ex. 28 at 5. *See generally* Def. Ex. 26. These amended returns also sought refunds for the 2004 and 2005 tax years. Def. Ex. 27 at 3; Def. Ex. 27 at 5. *See generally* Def. Ex. 26.

Mr. Bjorn states in his original declaration filed with the Court on July 24, 2017, that he "was responsible for making the five (5) year carryback election from 2009 to 2004 when [he] prepared the federal income tax returns for plaintiffs, Marc H. Pryde and Lisa R. Pryde." Bjorn Decl. at ¶ 3. Mr. Bjorn also states in this declaration that he "met the requirements to carry losses from 2009 to 2004 in accordance with Rev Proc 2009-26, section 4.01(3)(a)(i)." *Id.* at ¶ 7.

### 6. The American Recovery And Reinvestment Tax Act

In February 2009, Congress amended Section 172(b)(1)(H) of the I.R.C. to extend the carryback period to up to five years for 2008 net operating losses incurred by an "eligible small business." *See* American Recovery and Reinvestment Tax Act of 2009, Pub. L. No. 111-5 at § 1211, 123 Stat. 115. This law specifies that that the five-year NOL carryback election "shall be made in such manner as may be prescribed by the Secretary, and shall be made by the due date (including extension of time) for filing the taxpayer's return for the taxable year of the net operating loss." *Id.* (providing I.R.C. § 172(b)(1)(H)(iii) as it then existed).

In 2009, the United States Department of the Treasury (the "Treasury") and the IRS specified the manner of making a carryback election for 2008 NOLs in Revenue Procedure 2009-19. Rev. Proc. 2009-19, 2009-14 I.R.B. 747 (Apr. 6, 2009). This procedure required that eligible small businesses attach an election statement to their 2008 tax return that clearly elects to carryback an NOL under § 172(b)(1)(H) and states the length of the carryback. *Id*. § 4.01(3).

On May 11, 2009, the IRS issued Revenue Procedure 2009-26, which eliminated the requirement for a special election statement, "due to the fact that the [statutory amendment] and issuance of Rev. Proc. 2009-19 occurred midway through the current tax return filing season," and many eligible small businesses missed the requirements. Rev. Proc. 2009-26 at § 1.02, 2009-19 I.R.B. 935 (May 11, 2009). And so, under Revenue Procedure 2009-26, an eligible small business may make a carryback election by filing the appropriate tax form for the carryback year. *Id.* § 4.01(3)(a). Under this procedure, no election statement is required and the taxpayer's amended return applying the NOL must be filed within six months after the due date for filing the taxpayer's return for the taxable year of the applicable 2008 NOL, or by April 17, 2009. *Id*. § 4.01(3)(a)-(b).

### 7. The Workers, Homeownership, And Business Assistance Act

On November 6, 2009, President Obama signed into law a new amendment to I.R.C. § 172(b)(1)(H), as part of the Workers, Homeownership, and Business Assistance Act of 2009

("WHBAA").  *See* Pub. L. No. 111-92 at § 13(a), 123 Stat. 2984 (2009).[5]  The WHBAA extends the favorable five-year carryback election for NOLs to all taxpayers with an NOL for tax years 2008 or 2009.  *Id.* at § 13(a); *see also* I.R.C. § 172(b)(1)(H)(ii) (2009).  The statute also requires that the five-year NOL carryback election "shall be made in such manner as may be prescribed by the Secretary, and shall be made by the due date (including extension of time) for filing the return for the taxpayer's last taxable year beginning in 2009."  Pub. L. No. 111-92 at § 13(a); *see also* I.R.C. 172(b)(1)(H)(iii) (2009).

On December 7, 2009, the Treasury and the IRS provided guidance about the manner for making the carryback election under this new law in Revenue Procedure 2009-52.  Rev. Proc. 2009-52, 2009-49 I.R.B. 744 (Dec. 7, 2009).  Under Revenue Procedure 2009-52, a taxpayer must provide a specific election statement stating three pieces of information, namely: (1) that the taxpayer is electing to apply § 172(b)(1)(H) under Revenue Procedure 2009-52; (2) that the taxpayer is neither a Troubled Asset Relief Program ("TARP") recipient nor an affiliate of a TARP recipient in either 2008 or 2009; and (3) the length of the NOL carryback.  *Id.* at § 4.01(3)(a).  In addition, Revenue Procedure 2009-52 requires that the five-year NOL carryback election be made by the time period for the filing of the taxpayer's 2009 return.  *Id.* at § 4.01(3)(b).

### B.    PROCEDURAL HISTORY

Plaintiffs commenced this tax refund action on August 14, 2015.  *See generally* Compl. On December 14, 2015, the government answered the complaint.  *See generally* Answer.

On July 24, 2017, plaintiffs filed a request for judicial notice and documents in support thereof.  *See generally* Pl. Request for Judicial Notice; Pl. Exs. A-J.[6]

On August 1, 2017, plaintiffs filed a motion for summary judgment, or, in the alternative, partial summary judgment.  *See generally* Pl. Mot.  On September 6, 2017, the government filed a response and opposition to plaintiffs' motion for summary judgment, or, in the alternative,

---

[5] On December 19, 2014, Congress repealed Section 172(b)(1)(H) in the Tax Increase Prevention Act of 2014.  *See* Pub. L. No. 113-295 § 221(a)(30)(A), 128 Stat. 4010 (2014).

[6] On July 24, 2017, plaintiffs filed a motion for summary judgment, or, in the alternative, partial summary judgment and attachments in support thereof.  *See generally* Pl. MSJ; Bjorn Decl.  On July 27, 2017, plaintiffs filed a Notice of Errata and Correction to Plaintiffs' Motion for Summary Judgment, or, in the alternative, partial summary judgment.  *See generally* Pl. Notice, July 27, 2017.  On July 31, 2017, the Court directed plaintiffs to file a corrected version of their motion.  *See* Order, July 31, 2017.

partial summary judgment, a cross-motion for summary judgment and attachments in support thereof. *See generally* Def. Mot.; Def. Exs. 1-34.

On October 3, 2017, plaintiffs filed a response and opposition to the government's cross-motion for summary judgment and a reply in support of their motion for summary judgment, or, in the alternative, partial summary judgment and attachments in support thereof. *See generally* Pl. Resp; Bjorn Supp. Decl.; Pryde Supp. Decl. On October 17, 2017, the government filed a reply in support of its cross-motion for summary judgment. *See generally* Def. Reply.

These matters having been fully briefed, the Court addresses the parties' pending cross-motions.

III. **LEGAL STANDARDS**

A. **Jurisdiction And Tax Refund Claims**

This Court possesses subject-matter jurisdiction over claims for the "recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected." 28 U.S.C. § 1346(a)(1); *Dumont v. United States*, 85 Fed. Cl. 425, 427–28 (2009). And so, a taxpayer may bring an action in this Court to recover any internal revenue tax erroneously or illegally assessed or collected, provided that the taxpayer first duly files a claim for a refund with the IRS. I.R.C. § 7422(a); *United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 4 (2008); *Dumont*, 85 Fed. Cl. at 427–28.

Plaintiffs bear the burden to prove, by a preponderance of the evidence, that they are entitled to the tax deductions at issue in this case and the correct amount of the tax refund due. *United States v. Janis*, 428 U.S. 433, 440 (1976) (holding that the taxpayer bears the burden to prove the erroneous nature of the assessment as well as the amount the taxpayer is entitled to recover); *Charron v. United States*, 200 F.3d 785, 792 (Fed. Cir. 1999) (holding that, in a tax refund suit, taxpayers were required to prove not only the excludability of items from taxable income, but also the amount); *Danville Plywood Corp. v. United States*, 899 F.2d 3, 7-8 (Fed. Cir. 1990) (holding that after a taxpayer overcomes the presumption of correctness, it must still carry the ultimate burden of proof); *Cook v. United States*, 46 Fed. Cl. 110, 114–117 (2000) (same). "It is well established that a tax assessment is presumptively correct." *Arrington v. United States*, No. 96-5079, 1997 WL 101091, at *4 (Fed. Cir. Mar. 7, 1997). And so, plaintiffs will not recover in a tax refund case if they cannot prove the amount of the refund due. *See Janis*, 428 U.S. at 440; *Taylor v. Comm'r*, 70 F.2d 619, 620 (2d Cir. 1934), *aff'd*, 293 U.S. 507

(1935) (explaining that, in a refund suit, if the taxpayer fails to prove the amount due, the taxpayer may not recover everything owed to him "even though we know that the tax is too high"); *see also Int'l Paper Co. v. United States*, 36 Fed. Cl. 313, 322 (1996) (citing *Janis*, 428 U.S. at 440) (holding that the plaintiff, in order to recover, must prove "the precise dollar amount of the refund to which it is entitled"); *Sara Lee Corp. & Subs. v. United States*, 29 Fed. Cl. 330, 334 (1993) ("[P]laintiff then must prove the exact dollar amount of the alleged overpayment to which it claims a refund.") (citations omitted).

### B.    RCFC 56

Pursuant to RCFC 56, a party is entitled to summary judgment when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Biery v. United States*, 753 F.3d 1279, 1286 (Fed. Cir. 2014).  A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248.  A fact is "material" if it could "affect the outcome of the suit under the governing law."  *Id.*

The moving party bears the burden of demonstrating the absence of any genuine issues of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  And so, "'the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

In making a summary judgment determination, the Court does not weigh the evidence presented, but instead must "determine whether there is a genuine issue for trial."  *Liberty Lobby, Inc.*, 477 U.S. at 249; *see also Am. Ins. Co. v. United States*, 62 Fed. Cl. 151, 154 (2004); *Agosto v. INS*, 436 U.S. 748, 756 (1978) ("[A trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented . . . .").  The Court may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party . . . ."  *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587.

The above standard applies when the Court considers cross-motions for summary judgment.  *Principal Life Ins. Co. & Subsidiaries v. United States*, 116 Fed. Cl. 82, 89 (2014); *see also Estate of Hevia v. Portrio Corp.*, 602 F.3d 34, 40 (1st Cir. 2010).  And so, when both

parties move for summary judgment, "'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Abbey v. United States*, 99 Fed. Cl. 430, 436 (2011) (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

### C.    Res Judicata, Judicial Estoppel, And Judicial Notice

The United States Court of Appeals for the Federal Circuit has recognized that "[t]he doctrine of res judicata involves the related concepts of claim preclusion and issue preclusion." *Phillips/May Corp. v. United States*, 524 F.3d 1264, 1267 (Fed. Cir. 2008).  Claim preclusion bars a claim where: "(1) the parties are identical or in privity; (2) the first suit proceeded to a final judgment on the merits; and (3) the second claim is based on the same set of transactional facts as the first." *Cunningham v. United States*, 748 F.3d 1172, 1179 (Fed. Cir. 2014) (quoting *Ammex, Inc. v. United States*, 334 F.3d 1052, 1055 (Fed. Cir. 2003)); *see also Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981) ("A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.") (citations omitted).

The doctrine of collateral estoppel─or issue preclusion─protects litigants from the burden of relitigating an identical issue with the same party and promotes judicial economy by preventing needless litigation.  *Parklane Hosiery, Inc. v. Shore,* 439 U.S. 322, 331 (1979); *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 328-329 (1971).  A party asking the court to apply collateral estoppel must establish that:

> (1) the issue at stake is identical to the one involved in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in the first action; and (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Dana v. E.S. Originals, Inc*., 342 F.3d. 1320, 1323 (Fed. Cir. 2003) (internal quotation marks omitted) (quoting *Pleming v. Universal-Rundle Corp*., 142 F.3d 1354, 1359 (11th Cir. 1998)); *Banner v. United States*, 238 F.3d 1348, 1354 (Fed. Cir. 2001) (citing *Jet, Inc. v. Sewage Aeration Sys.*, 223 F.3d 1360, 1365-66 (Fed. Cir. 2000)).

Collateral estoppel may be used defensively or offensively.  *Parklane Hosiery*, 439 U.S. at 329.  Offensive collateral estoppel–when a previous case precludes a defendant from litigating

an issue in its defense–may require "a stronger showing that the prior opportunity to litigate was adequate . . . ." *Id*. at 331 n.16 (citation omitted).  The United States Supreme Court has also held that courts should refrain from applying offensive collateral estoppel out of fairness to the defendant if:  (1) plaintiff could have easily joined the earlier action, or (2) where application of offensive collateral estoppel would be unfair to the defendant.  *Id*. at 330.  Application of offensive collateral estoppel would be unfair to the defendant if:  (1) the defendant did not have an incentive to fully litigate in the previous litigation; (2) the defendant did not have a full chance to litigate the issues due to procedural disadvantages in the previous litigation; or (3) there exist inconsistent judgments on record.  *Id*.

In addition, the United States Court of Appeals for the Federal Circuit has held that application of offensive collateral estoppel also poses the danger of giving multiple plaintiffs a "no lose incentive" to wait and take advantage of a ruling against the same defendant.  *Dana*, 342 F.3d. at 1325-26 (citation omitted).  Given this, "offensive collateral estoppel must be applied with circumspection, even when the legal requirements for applying collateral estoppel are satisfied."  *Id.* at 1326.

The doctrine of judicial estoppel is applied to estop a party that has "successfully urge[d] a particular position in a legal proceeding . . . from taking a contrary position in a subsequent proceeding where its interests have changed."  *Buckley v. United States*, 57 Fed. Cl. 328, 341 (2003) (citations omitted).  Judicial estoppel is "designed to prevent the perversion of the judicial process and, as such, is intended to protect the courts rather than the litigants."  *Id*.  And so, the United States Court of Appeals for the Federal Circuit has identified three factors that should be considered when determining whether judicial estoppel is appropriate to bar a claim: (1) whether the party's later position is clearly inconsistent with its earlier position; (2) whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.  *N. Am. Rubber Thread Co. v. United States*, 593 F.3d 1346, 1354 (Fed Cir. 2010) (citations omitted).

Lastly, this Court may take judicial notice consistent with the provisions of Federal Rule of Evidence 201. *See* Fed. R. Evid. 201; *see also Wash. Mut., Inc. v. United States*, 130 Fed. Cl. 653, 704 (2017); *Canpro Invs. Ltd. v. United States*, 130 Fed. Cl. 320, 331 n.2 (2017); *Confidential Informant 59-05071 v. United States*, No. 11-153, 2017 U.S. Claims LEXIS 1374, at *29 (Fed. Cl. Oct. 16, 2017); *Rodriguez v. Sec'y of HHS*, 91 Fed. Cl. 453, 460 (2010), *aff'd*, 632 F.3d 1381 (Fed. Cir. 2011). Pursuant to Federal Rule of Evidence 201, the Court "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201. Whether to take judicial notice is a matter of discretion for the Court. *See K/S Himpp v. Hear-Wear Techs., LLC*, 751 F.3d 1362, 1367 (Fed. Cir. 2014); *Murakami v. United States*, 398 F.3d 1342, 1355 (Fed. Cir. 2005).

### D.     Section 172

Section 172 of the Internal Revenue Code generally allows a taxpayer that has a net operating loss during any taxable year to carryback that loss two years and to carryforward that loss 20 years, to offset income received in those years. *See* I.R.C. at § 172(a)-(b). Section 172 provides, in relevant part, that:

> **(a) Deduction allowed.**−There shall be allowed as a deduction for the taxable year an amount equal to the aggregate of (1) the net operating loss carryovers to such year, plus (2) the net operating loss carrybacks to such year. For purposes of this subtitle, the term "net operating loss deduction" means the deduction allowed by this subsection.
>
> **(b) Net operating loss carrybacks and carryovers.--**
>     **(1) Years to which loss may be carried.--**
>         **(A) General rule.**--Except as otherwise provided in this paragraph, a net operating loss for any taxable year--
>             **(i)** shall be a net operating loss carryback to each of the 2 taxable years preceding the taxable year of such loss, and
>             **(ii)** shall be a net operating loss carryover to each of the 20 taxable years following the taxable year of the loss.

I.R.C. § 172(a)-(b). Section 172 also defines "net operating loss" to mean "the excess of the deductions allowed by this chapter over the gross income." *Id*. at § 172(c). In addition, under Section 172, NOLs that arise from theft may be carried back for up to three years. *Id*. at § 172(b)(1)(E).

With regards to the timing of bringing a tax refund claim based upon a NOL carryback, Section 6511 of the I.R.C. provides that the time for filing an administrative refund claim is typically three years from the due date for the return for the year in which the NOL arose, when the basis for a tax refund is a NOL carryback.  I.R.C. at § 6511(d)(2)(A).  But, Congress has periodically extended the carryback period beyond the typical two or three years, and specified a separate deadline for the taxpayer to elect the extended carryback.  *See Tualatin Valley Builders Supply, Inc. v. United States*, 522 F.3d 937, 943 (9th Cir. 2008); *McAllister v. United States*, 125 Fed. Cl. 167, 169-70 (2016).

Specifically relevant to this dispute, on November 6, 2009, President Obama signed into law a new amendment to I.R.C. § 172(b)(1)(H), which extended the favorable five-year carryback election for NOLs to all taxpayers with an NOL for tax years 2008 or 2009.  *See* Workers, Homeownership, and Business Assistance Act of 2009, Pub. L. No. 111-92 at § 13(a), 123 Stat. 2992; *see also* I.R.C. § 172(b)(1)(H) (2009).  This law requires that the five-year NOL carryback election "shall be made in such manner as may be prescribed by the Secretary, and shall be made by the due date (including extension of time) for filing the return for the taxpayer's last taxable year beginning in 2009."  Pub. L. No. 111-92 at § 13(a); *see also* I.R.C. § 172(b)(1)(H)(iii)(II) (2009).

On December 7, 2009, the Treasury Department and the IRS provided guidance regarding how to make the carryback election under this law in Revenue Procedure 2009-52. Rev. Proc. 2009-52, 2009-49 I.R.B. 744 (Dec. 7, 2009).  Under Revenue Procedure 2009-52, a taxpayer must provide a specific election statement stating three pieces of information, namely: (1) that the taxpayer is electing to apply § 172(b)(1)(H) under Revenue Procedure 2009-52; (2) that the taxpayer is neither a Troubled Asset Relief Program ("TARP") recipient nor an affiliate of a TARP recipient in either 2008 or 2009; and (3) the length of the NOL carryback.  *Id*. at § 4.01(3)-(4).  In addition, Revenue Procedure 2009-52 requires that the five-year NOL carryback election be made by the time period for the filing of the taxpayer's 2009 return.  *Id*. at § 4.01(3).

### E.    Section 165

Under Section 165 of the I.R.C., a taxpayer may deduct from the taxpayer's income any unreimbursed loss attributable to theft.  *See* IRC § 165(a), (c), (e); Treas. Reg. § 1.165-8(a). Specifically, Section 165 provides, in relevant part, that:

> **(a) General rule.–**There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

**(b) Amount of deduction.**--For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.

**(c) Limitation on losses of individuals.**−In the case of an individual, the deduction under subsection (a) shall be limited to--

> **(1)** losses incurred in a trade or business;

> **(2)** losses incurred in any transaction entered into for profit, though not connected with a trade or business; and

> **(3)** except as provided in subsection (h), losses of property not connected with a trade or business or a transaction entered into for profit, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. . . .

**(e) Theft losses.**−For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss.

I.R.C. § 165(a)-(c), (e).  The Treasury regulations implementing Section 165 also provide that "the term 'theft' shall be deemed to include, but shall not necessarily be limited to, larceny, embezzlement, and robbery."  Treas. Regs. § 1.165-8(5).  Neither I.R.C. § 165 nor its implementing regulations provide any further guidance for what constitutes a theft.  *See generally* I.R.C. § 165; Treas. Regs. § 1.165-8.  But, this Court has generally recognized that, to constitute a theft, the perpetrator must have had the specific intent to deprive the victim of his property.  *See Goeller*, 109 Fed. Cl. at 549; *Schroerlucke v. United States*, 100 Fed. Cl. 584, 598 (2011); *see also De Fusco v. Comm'r*, 38 T.C.M. (CCH) 920, 922 (1979); Model Penal Code § 223.3 (Am. Law. Inst. 2016).

F.     **Section 166**

Lastly, Section 166(a) of the IRC, allows as a deduction any bona fide debt that becomes worthless within the taxable year.  I.R.C. § 166(a).  Specifically, Section 166 provides, in relevant part, that:

**(a) General rule.**—

> **(1) Wholly worthless debts.**—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

> **(2) Partially worthless debts.**—When satisfied that a debt is recoverable only in part, the Secretary may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.

**(b) Amount of deduction.**—For purposes of subsection (a), the basis for determining the amount of the deduction for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. . . .

**(d) Nonbusiness debts.**—

    **(1) General rule.**—In the case of a taxpayer other than a corporation--
        **(A)** subsection (a) shall not apply to any nonbusiness debt; and

        **(B)** where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 1 year.

    **(2) Nonbusiness debt defined.**—For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than—

        **(A)** a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or

        **(B)** a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

*Id.* § 166(a)-(b), (d).

Section 166(d)(2) defines a business debt as "a debt created or acquired . . . . in connection with a trade or business of the taxpayer," or "a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business." *Id.* § 166(d)(2). Courts have recognized that, to be eligible to deduct a loss as a bad business debt, an individual taxpayer must show that the taxpayer was engaged in a trade or business and that the debt was proximately related to that trade or business. *See Putoma Corp. v. Comm'r*, 66 T.C. 652, 673 (1976), *aff'd*, 601 F.2d 734 (5th Cir. 1979); Treas. Reg. § 1.166–5(b). Courts have also recognized that the question of whether a purported loan is a bona fide debt for tax purposes is determined from the facts and circumstances of each case. *See A.R. Lantz Co. v. United States, 424 F.2d 1330, 1333 (9th Cir. 1970); Gross v. Comm'r*, 401 F.2d 600, 603 (9th Cir. 1968), *aff'g* T.C. Memo. 1967-31; *Dixie Dairies Corp. v. Comm'r*, 74 T.C. 476, 493 (1980). And so, to give rise to a deduction under Section 166(a)(1), a debt must have become wholly worthless during the tax year. Treas. Reg. § 1.166–3(b); *see Bodzy v. Comm'r*, 321 F.2d 331,335 (5th Cir. 1963),

*aff'g in part, rev'g in part* T.C. Memo. 1962-40; *see also Rutter v. Comm'r*, T.C. Memo 2017-174, 114 T.C.M (CCH) 282 (2017).

## IV.   LEGAL ANALYSIS

The parties have filed cross-motions for summary judgment on several issues related to whether plaintiffs may recover in this tax refund matter.

First, plaintiffs have moved for summary judgment, or, in the alternative, partial summary judgment, upon eight grounds, namely that: (1) the doctrine of res judicata precludes the re-litigation of certain issues regarding whether Mr. Mastro acted to defraud his creditors, or made fraudulent transfers in this case, because those matters have been previously litigated in the Bankruptcy Proceedings; (2) the doctrine of collateral estoppel precludes the re-litigation of certain issues regarding whether Mr. Mastro was insolvent at the time of the Mastro Loans, because those issues have also been previously litigated in the Bankruptcy Proceedings; (3) the Court may take judicial notice of several documents related to the Bankruptcy Proceedings and the subsequent federal criminal proceeding involving Mr. Mastro; (4) the government is estopped from challenging the findings of fact and conclusions of law in the Bankruptcy Proceedings under the doctrine of judicial estoppel; (5) if the Court applies the doctrines of res judicata or collateral estoppel with respect to the Bankruptcy Proceedings, plaintiffs have established that they were the victims of a theft by false pretenses; (6) if the Court applies the doctrines of res judicata or collateral estoppel with respect to the Bankruptcy Proceedings, plaintiffs have established that they had no prospect of recovering the outstanding balances for the Mastro Loans; (7) plaintiffs may deduct the Mastro Loans as a bad business debt; and (8) plaintiffs properly elected to carry their net operating losses in 2009 back five years.  Pl. Mot. at 7-52.

The government opposes plaintiffs' motion upon the grounds that the doctrines of res judicata, collateral estoppel, judicial estoppel, and judicial notice are not applicable to this case, and that plaintiffs have not shown that they are entitled to a theft loss deduction because there are material facts in dispute regarding whether plaintiffs were the victims of a theft.  Def. Mot. at 31-45.

In addition the government has moved for summary judgment in its favor upon the grounds that: (1) plaintiffs' tax refund claims for tax years 2004 and 2005 fail because plaintiffs did not timely file their five-year net operating loss carryback election, or their amended returns

for 2004 and 2005; (2) plaintiffs are not entitled to a bad business debt deduction because the Mastro Loans are personal rather than business loans; (3) plaintiffs are estopped from claiming a bad business debt; and (4) plaintiffs cannot establish an entitlement to relief under the safe harbor set forth in Revenue Procedure 2009-20. *Id.* at 13-30.

For the reasons discussed below, the undisputed material facts in this matter show that application of claim preclusion, issue preclusion, judicial estoppel, and judicial notice are not warranted in this case. In addition, the undisputed material facts show that plaintiffs did not timely file their five-year net operating loss carryback election with their 2009 return, or timely file their amended returns for tax years 2004 and 2005. And so, the Court **DENIES** plaintiffs' motion for summary judgment, or, in the alternative, partial summary judgment; **GRANTS-IN-PART** the government's cross-motion for summary judgment; and **DISMISSES** the complaint.

### A.    Application Of Claim Preclusion, Issue Preclusion, Judicial Estoppel, And Judicial Notice Are Unwarranted In This Case

### 1.    The Court Declines To Apply Claim Preclusion

As an initial matter, plaintiffs inappropriately request that the Court apply claim preclusion with respect to the Bankruptcy Proceedings before the United States Bankruptcy Court for the Western District of Washington in this *de novo* tax refund matter. The United States Court of Appeals for the Federal Circuit has held that claim preclusion applies when: (1) the parties are identical to, or in privity with, the parties in the prior litigation; (2) the first suit proceeded to a final judgment on the merits; and (3) the second suit is based on the same set of transactional facts as the first suit. *See, e.g.*, *Cunningham v. United States*, 748 F.3d 1172, 1179 (Fed. Cir. 2014). The Supreme Court has also recognized that, when the government is not a party to a litigation, the government is only in privity with a party to that litigation when the government had a significant role in the litigation. *Montana v. United States*, 440 U.S. 147, 154 (1979).

In this case, it is undisputed that the government was not a party to the Bankruptcy Proceedings before the United States Bankruptcy Court for the Western District of Washington. *See* Pl. MSJ at 9-12; Def. Mot. at 33. Because the parties to that proceeding were Mr. Mastro and his creditors, the undisputed material facts in this case also make clear that the government was also not in privity with any party to those proceedings. *See generally In re Mastro*, 465 B.R. 576 (W.D. Wash. 2011). And so, the Court declines to apply claim preclusion with respect to the Bankruptcy Proceedings in this matter.

### 2.    The Court Declines To Apply Issue Preclusion

Plaintiffs' request that the Court apply issue preclusion with respect to the Bankruptcy

Proceedings is similarly inappropriate.  The Federal Circuit has held that a party asking the court

to apply collateral estoppel, or issue preclusion, must establish that:

> (1) the issue at stake is identical to the one involved in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in the first action; and (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Dana v. E.S. Originals, Inc.*, 342 F.3d. 1320, 1323 (Fed. Cir. 2003) (quoting *Pleming v.*

*Universal-Rundle Corp.*, 142 F.3d 1354, 1359 (11th Cir. 1998)); *see also Christo v. Padgett*, 223

F.3d 1324, 1339 (11th Cir. 2000); *Banner v. United States*, 238 F.3d 1348, 1354 (Fed. Cir. 2001)

(citing *Jet, Inc. v. Sewage Aeration Sys.*, 223 F.3d 1360, 1365-66 (Fed. Cir. 2000)).  Issue

preclusion may be used defensively or offensively.  *Parklane Hosiery, Inc. v. Shore*, 439 U.S.

322, 326 (1979).  Issue preclusion is not appropriate here because, as discussed above, the

government was not a party to the Bankruptcy Proceedings.  *See* Pl. Mot. at 12-17; Def. Mot. at

34-35.  *See generally In re Mastro*, 465 B.R. 576.  Given this, the government did not have "a

full and fair opportunity to litigate" the issues presented in this case in the prior Bankruptcy

Proceedings.  And so, the Court must also decline to apply issue preclusion in this matter.

### 3.    The Court Declines To Take Judicial Notice Of The Factual Findings And Legal Conclusions Of Other Courts

In addition, the Court declines to take judicial notice of the findings of fact and

conclusions of law of the United States Bankruptcy Court for the Western District of Washington

and the United States District Court for the Western District of Washington in connection with

the proceedings involving Mr. Mastro before those courts.  In their motion, plaintiffs request that

the Court take judicial notice of several documents related to either the Bankruptcy Proceedings,

or the subsequent federal criminal proceedings involving Mr. Mastro before the United States

District Court for the Western District of Washington.  Pl. Mot. at 7-9.

The United States Court of Appeals for the Federal Circuit has held that the question of

whether to take judicial notice is a matter of discretion for this Court.  *See K/S Himpp v. Hear-*

*Wear Techs., LLC*, 751 F.3d 1362, 1367 (Fed. Cir. 2014).  Generally, the Court "may judicially

notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b); *see also Wash. Mut., Inc. v. United States*, 130 Fed. Cl. 653, 704 (2017); *Canpro Invs. Ltd. v. United States*, 130 Fed. Cl. 320, 331 n.2 (2017); *Confidential Informant 59-05071 v. United States*, No. 11-153, 2017 U.S. Claims LEXIS 1374, at *29-30 (Fed. Cl. Oct. 16, 2017); *Rodriguez v. Sec'y of HHS*, 91 Fed. Cl. 453, 460 (2010), *aff'd*, 632 F.3d 1381 (Fed. Cir. 2011).

But, courts have also recognized that it is not appropriate for a court to adopt the factual findings and legal conclusions of other courts. *See Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388-89 (2d Cir. 1992) ("A court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'"); *see also Murakami v. United States*, 46 Fed. Cl. 731, 739-40 (2000) (observing that, even where judicial notice is appropriate to establish that a document exists, the Court may not always take judicial notice of the facts contained therein). Plaintiffs request that the Court do precisely this with regards to the Bankruptcy Proceedings and criminal proceedings involving Mr. Mastro. And so, the Court declines to take judicial notice of the findings of fact and conclusions of law of these other courts.

### 4.    Judicial Estoppel Is Unwarranted

Lastly, application of the doctrine of judicial estoppel with respect to the Bankruptcy Proceedings is also unwarranted in this case, because plaintiffs have not shown that such extreme relief is necessary here. In their motion for summary judgment, or, in the alternative, partial summary judgment, plaintiffs request that the Court estop the government from challenging the findings of fact and conclusions of law of the United States Bankruptcy Court for the Western District of Washington, because the government relied upon those factual findings and legal conclusions in the subsequent criminal proceedings involving Mr. Mastro before the United States District Court for the Western District of Washington. Pl. Mot. at 9.

The United States Court of Appeals for the Federal Circuit has identified three factors that the Court should consider when determining whether judicial estoppel is appropriate: (1) the party's later position is clearly inconsistent with its earlier position; (2) the party has persuaded the first court of that party's position; and (3) the party seeking to assert an inconsistent position

would impose an unfair detriment on the opposing party if not estopped.  *N. Am. Rubber Thread Co. v. United States*, 593 F.3d 1346, 1354 (Fed. Cir. 2010).  None of these factors have been met here.

First, plaintiffs have not shown that the government's position in this case "is clearly inconsistent" with its earlier position in the criminal proceedings before the United States District Court for the Western District of Washington, because the criminal proceedings addressed actions that Mr. Mastro undertook during the Bankruptcy Proceedings.  In contrast, the actions at issue in this litigation occurred prior to the Bankruptcy Proceedings.  *See generally* Compl.; Pl. Ex. J.

Plaintiffs also fail to show that the government successfully persuaded the United States District Court for the Western District of Washington of its position in the criminal proceedings involving Mr. Mastro, because it is undisputed that the government did not fully prosecute this case after Mr. Mastro fled the United States.  *See also* Pl. Ex. I at 3; Def. Mot. at 9; *see, e.g.*, *United States v. McCaskey*, 9 F.3d 379 (5th Cir. 1993) (holding that "[t]he mere fact that a United States Magistrate Judge signed the criminal complaint charging the defendants . . . does not suggest that the government ever 'successfully maintained'" that position in the first action);. Plaintiffs similarly fail to establish that the government is "seeking to assert an inconsistent position" in this matter, or that doing so "would impose an unfair detriment" on plaintiffs if not estopped, given that the criminal proceedings involving Mr. Mastro were not fully prosecuted. And so, the Court declines to apply judicial estoppel to estop the government from challenging the findings of fact and conclusions of law of either the United States Bankruptcy Court for the Western District of Washington, or the United States District Court for the Western District of Washington in this proceeding.

Because application of claim preclusion, issue preclusion, judicial notice, and judicial estoppel are unwarranted in this case, the Court **DENIES** plaintiffs' motion for summary judgment, or, in the alternative, for partial summary judgment, upon the grounds that: (1) the doctrine of res judicata precludes the re-litigation of certain issues regarding whether Mr. Mastro acted to defraud his creditors or made fraudulent transfers in this case because those issues were previously litigated in the Bankruptcy Proceedings; (2) the doctrine of collateral estoppel precludes the re-litigation of certain issues regarding whether Mr. Mastro was insolvent at the time of the Mastro Loans, because those issues were previously litigated in the Bankruptcy

Proceedings; (3) the Court may take judicial notice of several documents related to the Bankruptcy Proceedings and the subsequent federal criminal proceeding involving Mr. Mastro; and (4) the government is estopped from challenging the findings of fact and conclusions of law in the Bankruptcy Proceedings under the doctrine of judicial estoppel.

Plaintiffs also rely upon the findings of fact and conclusions of law of the United States Bankruptcy Court for the Western District of Washington and the United States District Court for the Western District of Washington to seek summary judgment upon the grounds, that: (1) plaintiffs were victims of a theft by false pretenses and (2) plaintiffs have established that they had no prospect of recovering the outstanding balance for the Mastro Loans.  And so, the Court also **DENIES** plaintiffs' motion for summary judgment, or, in the alternative, partial summary judgment with respect to these issues.

### B.    The Undisputed Material Facts Show That Plaintiffs' Returns Are Untimely

Both parties have moved for summary judgment on the issue of whether plaintiffs properly and timely filed a net operating loss five-year carryback election with their 2009 return—and whether plaintiffs timely filed their amended returns for 2004 and 2005—to enable plaintiffs to recover a refund for tax years 2004 and 2005.  For the reasons discussed below, the undisputed material facts in this matter show that plaintiffs did not timely file their 2004 and 2005 amended returns and that plaintiffs also did not timely file a net operating loss five-year carryback election statement with their 2009 return.  And so, plaintiffs have not established that they are entitled to any recovery in this tax refund dispute.

### 1.    I.R.C. § 172 As Amended By The WHBAA Applies To Plaintiff's Tax Refund Claims

As an initial matter, the undisputed material facts in this case make clear that plaintiffs' tax refund claim is governed by I.R.C. § 172(b)(1)(H), as amended by the Workers, Homeownership, and Business Assistance Act of 2009.  *See* Pub. L. No. 111-92 § 13(a), 123 Stat. 2984 (2009).  Specifically relevant here, the WHBAA extended the five-year carryback election for NOLs to all taxpayers with a net operating loss for either tax year 2008 or 2009.  *Id.*; *see also* I.R.C. § 172(b)(1)(H)(ii) (2009).  Because plaintiffs claim a NOL in 2009, and plaintiffs are individual taxpayers, the WHBAA applies to their tax refund claim and allows plaintiffs to make a five-year NOL carryback election provided that this election is timely made in the manner prescribed by the statute.  Pub. L. No. 111-92 at § 13(a).

In this regard, the WHBAA requires that the five-year NOL carryback election "shall be made in such manner as may be prescribed by the Secretary, and *shall be made by the due date (including extension of time) for filing the return for the taxpayer's last taxable year beginning in 2009.*" *Id.* (emphasis supplied); *see also* I.R.C. § 172(b)(1)(H)(iii) (2009). The Treasury Department has provided guidance to taxpayers regarding how and when to make the five-year NOL carryback election under the WHBAA, in Revenue Procedure 2009-52. *See* Rev. Proc. 2009-52.[7] This guidance requires that a taxpayer must provide a five-year NOL carryback election statement that includes three pieces of information, namely: (1) that the taxpayer is electing to apply § 172(b)(1)(H) under Revenue Procedure 2009-52; (2) that the taxpayer is

---

[7] Rev. Proc. 2009-52 provides in relevant part that:

SECTION 4. APPLICATION

01 Time and manner of making the election under § 172(b)(1)(H).

(1) In general. A taxpayer within the scope of this revenue procedure may make the election under § 172(b)(1)(H) or § 810(b)(4) by following the procedure described in either section 4.01(3) or section 4.01(4) of this revenue procedure. The procedures under this revenue procedure that apply to NOLs and the election under § 172(b)(1)(H) also apply to a loss from operations of a life insurance company and the election under § 810(b)(4).

. . . .

(3) Electing on a federal income tax return for the taxable year of the applicable NOL.

(a) What to file. A taxpayer may make the election under § 172(b)(1)(H) by attaching a statement to the taxpayer's federal income tax return for the taxable year in which the applicable NOL arises. A taxpayer that filed its federal income tax return for the taxable year of the applicable NOL may make the election by attaching a statement to an amended return for the taxable year of the applicable NOL. The election statement must state that the taxpayer is electing to apply § 172(b)(1)(H) or § 810(b)(4) under Rev. Proc. 2009-52, and that the taxpayer is not a TARP recipient nor, in 2008 or 2009, an affiliate of a TARP recipient. The statement must specify the length of the NOL carryback period the taxpayer elects (3, 4, or 5 years).

(b) When to file. A taxpayer must file the election statement with the taxpayer's original or amended federal income tax return for the taxable year of the applicable NOL on or before the due date (including extensions) for filing the return for the taxpayer's last taxable year beginning in 2009.

(c) Carryback applications or refund claims. A taxpayer that makes the § 172(b)(1)(H) election under this section 4.01(3) must attach a copy of the election statement to the taxpayer's claim for tentative carryback adjustment (Form 1045, Application for Tentative Refund; or Form 1139, Corporation Application for Tentative Refund) or amended return applying the applicable NOL to the carryback year. The due date for timely filing a claim for tentative carryback adjustment on Form 1045 or 1139 for a taxpayer that makes the § 172(b)(1)(H) election is extended to the due date (including extensions) for filing the return for the taxpayer's last taxable year beginning in 2009.

neither a TARP recipient nor an affiliate of a TARP recipient in either 2008 or 2009; and (3) the length of the NOL carryback.  *Id*. at § 4.01(3)(a).  This guidance also requires that the five-year NOL carryback election be made by the time period for the filing of the taxpayer's 2009 return.  *Id*. at § 4.01(3)(b).  In addition, the Treasury's guidance similarly requires that a taxpayer that is making a five-year NOL carryback election also attach a copy of the requisite carryback election statement to the taxpayer's amended return applying the net operating loss to the carryback year.  *Id*. at § 4.01(3)(c).  And so, pursuant to Revenue Procedure 2009-52 and the WHBAA, plaintiffs must have filed their five-year NOL carryback election statement, and their amended returns for tax years 2004 and 2005, by the due date for their 2009 returns.  *Id*.

### 2.   Plaintiffs Failed To File Timely Amended Returns For Tax Years 2004 And 2005

The undisputed material facts in this matter show that plaintiffs did not timely file their amended 2004 and 2005 tax returns.  It is undisputed that the due date for plaintiffs' 2009 return was October 15, 2010.  *See* Def. Mot. at 5; Bjorn Supp. Decl. at Ex. F at 8; *see also* I.R.C. §§ 6072(a), 6081; Treas. Regs. § 301.9100-2(b).  And so, under the WHBAA and Revenue Procedure 2009-52, plaintiffs were also required to file their amended 2004 and 2005 returns applying their net operating loss to the carryback years, and their five-year NOL carryback election statement, by October 15, 2010.  Rev. Proc. 2009-52 at § 4.01(3)(b).

Plaintiffs have not established that they filed their 2004 and 2005 amended returns by October 15, 2010.  In this regard, the IRS's certified transcripts show that plaintiffs filed their amended 2004 and 2005 tax returns on April 18, 2011−more than six months after the due date for these amended returns.  Def. Ex. 27 at 3; Def. Ex. 28 at 5.  The Court presumes that the IRS's certified transcripts are "true, accurate, and correct."  *See Davis v. United States*, 43 Fed. Cl. 92, 94 (1999).  To overcome this presumption, plaintiffs must "present[] reliable evidence . . . strong enough to suggest that it is highly probable that the filing has taken place."  *Id.*  Plaintiffs have not done so here.

Plaintiffs do not dispute that their amended return for 2005 was untimely.  *See* Pl. Resp. at 22-23.  *See generally* Bjorn Supp. Decl.  In addition, while plaintiffs do contend that their 2004 amended return was timely filed with the IRS, they fail to provide any reliable evidence to support this contention.  Specifically, plaintiffs have provided the Court with a document that they represent to be a copy of their 2004 amended return.  *See generally* Bjorn Decl. at Ex. C.

But, this document is unsigned and undated. *Id*. at 7. And so, plaintiffs have not provided the Court with any reliable evidence to show that their 2004 amended return was actually filed with the IRS by October 15, 2010. *See Davis*, 43 Fed. Cl. at 94.

The Court also observes that the document that plaintiffs identify as their 2004 amended return does not contain the carryback election statement required under Revenue Procedure 2009-52. *See* Rev. Proc. 2009-52 at § 4.01(3)(a), (c). *See generally* Bjorn Decl. at Ex. C. Given this, the undisputed material facts in this case show that plaintiffs did not timely file their amended 2004 or 2005 tax returns with the IRS as required by the WHBAA and Revenue Procedure 2009-52.

Because plaintiffs have not established that they timely filed their 2004 and 2005 amended returns, plaintiffs cannot establish that they are entitled to a tax refund in this matter for tax years 2004 and 2005. And so, the Court **DENIES** plaintiffs' motion for summary judgment, or, in the alternative, partial summary judgment and **GRANTS** the government's cross-motion for summary judgment on this issue.

> **3.      Plaintiffs Did Not Timely File Their Carryback Election Statement**

Although the Court need not reach this issue, the undisputed material facts in this case also show that plaintiffs did not timely file the five-year NOL carryback election statement to accompany their 2009 tax return. As discussed above, under Revenue Procedure 2009-52 and I.R.C. § 172(b)(1)(H) as amended by the WHBAA, plaintiffs must have filed their five-year NOL carryback election statement with the IRS by October 15, 2010. Pub. L. No. 111-92 at § 13(a); *see also* I.R.C. § 172(b)(1)(H) (2009); Rev. Proc. 2009-52 at § 4.01(3)(a). Again, plaintiffs have not established that they have done so here.

In this regard, the IRS's records show that plaintiffs filed their 2009 return on May 28, 2010. Def. Ex. 23 at 2. *See generally* Def. Ex. 14. But, there is no genuine dispute that this return does not contain a five-year NOL carryback election statement. Pl. Mot. at 52; Pl. Resp. at 22-23. *See generally* Def. Ex. 14. There is also no evidence in these IRS records to indicate that plaintiffs subsequently filed another return for tax year 2009 by October 15, 2010, that contained their five-year NOL carryback election statement. *See generally* Def. Exs. 23-26. And so, the Court presumes that the IRS's records regarding plaintiffs' 2009 return are "true,

accurate, and correct," unless plaintiffs put forward reliable evidence to the contrary.  *Davis*, 43 Fed. Cl. at 94.

In their motion for summary judgment, or, in the alternative, partial summary judgment, plaintiffs point to an unsigned and undated copy of their 2009 tax return, which includes a carryback election statement to show that they timely filed their five-year NOL carryback election.  Pl. Mot. at 52; Pl. Resp. at 22-23.  *See generally* Bjorn Supp. Decl. at Ex. F.  While plaintiffs maintain that they filed this document with the IRS on May 19, 2010, they put forward no evidence to show that this document was actually filed with the IRS at that time.  Bjorn Supp. Decl. at ¶ 6.  *See generally* Bjorn Supp. Decl. at Ex. F.  And so, again, the Court is unable to rely upon the evidence provided by plaintiffs to determine whether, and when, plaintiffs filed their five-year NOL carryback election statement.  *See Davis*, 43 Fed. Cl. at 94.

The Court is also unpersuaded by the representations made by plaintiffs' accountant, Jex Bjorn, in his supplemental declaration regarding the filing of plaintiffs' five year NOL carryback election statement.  In his supplemental declaration, Mr. Bjorn states that he included a five-year NOL carryback election statement with plaintiffs' original 2009 return that was filed with the IRS on May 19, 2010 and he attached a copy of this return to his supplemental declaration.  Bjorn Supp. Decl. at ¶¶ 6-7; *see* Bjorn Supp. Decl. at Exs. F-G.  But, this statement contradicts Mr. Bjorn's prior deposition testimony, in which he stated that the return attached to his supplemental declaration was "a test thing," which was not intended to be filed with the IRS.  Def. Ex. 11(a) at 12-13.

The Court is similarly unpersuaded by the representations made by Marc Pryde in his supplemental declaration regarding the timeliness of plaintiffs' five-year NOL carryback election statement.  In his supplemental declaration, Mr. Pryde states that he "personally verified that Jex [Bjorn] affixed the five-year carryback to the 2009 original 1040 return" filed with the IRS in May 2010.  Pryde Supp. Decl. at ¶ 37; *see also* Pryde Supp. Decl. at ¶ 38.  But, this statement contradicts Mr. Pryde's prior deposition testimony on this topic, in which he testified that he did not know what a five-year carryback election looked like or recall Mr. Bjorn giving him a five-year carryback election statement.  *See* Def. Ex. 2(a) at 3-4.  Marc Pryde also stated in his deposition testimony that he did not recall either signing plaintiffs' original 2009 return in May 2010, or how this return was filed with the IRS.  *See id*. at 4-5.  Given the contradictions in the

evidence put forward by plaintiffs, plaintiffs simply have not established that they timely filed a NOL carryback election statement with their 2009 tax return. *Grand Arcadian, Inc. v. United States*, 87 Fed. Cl. 193, 206 (2009) (holding that under the sham affidavit rule, a trial court may disregard supplemental affidavits which are inconsistent with prior deposition testimony unless the affiant also provides a harmonizing explanation). This failure is also fatal to their tax refund claim for tax years 2004 and 2005. And so, the Court **GRANTS** the government's cross-motion for summary judgment and **DENIES** plaintiffs' motion for summary judgment, or, in the alternative, partial summary judgment on this issue.[8]

## V.   CONCLUSION

In sum, the undisputed material facts in this matter show that application of claim preclusion, issue preclusion, judicial estoppel, and judicial notice are not warranted in this case. In addition, the undisputed material facts in this matter show that plaintiffs have not timely filed either their amended 2004 and 2005 tax returns, or the five-year NOL carryback election statement to accompany their 2009 tax return. And so, plaintiffs have not met their burden to establish that they are entitled to a tax refund for tax years 2004 and 2005.

In light of the foregoing, the Court:

1. **DENIES** plaintiffs' motion for summary judgment, or, in the alternative, partial summary judgment;

2. **GRANTS-IN-PART** the government's cross-motion for summary judgment; and

3. **DISMISSES** the complaint.

---

[8] Because the undisputed material facts show that plaintiffs failed to timely file their amended 2004 and 2005 tax returns and their five-year NOL carryback election statement, the Court does not reach the remaining issues raised in the parties' cross-motions for summary judgment.

The Clerk shall enter judgment accordingly.

The parties shall  bear their own costs.

**IT IS SO ORDERED.**


s/ Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
Judge